FEB 1 1 2000

OA 91 Criminal Complaint

# United States District Court

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

_____NORTHERN_____ DISTRICT OF _____NORTHERN CALIFORNIA_____

**MEJ**

UNITED STATES OF AMERICA
V.

FRANK SALVADOR SOLORZA

## CRIMINAL COMPLAINT

Case Number: **3 09 70139**

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about February 10, 2009 in San Mateo County, in

(Date)

the Northern District of California defendant(s) did,

(Track Statutory Language of Offense)

falsely assume or pretend to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acted as such, and in such pretended character demanded money, and aided and abetted such conduct,

in violation of Title ____18____ United States Code, Section(s) ____912 and 2____ .

The maximum penalties are: 3 years in prison, 3 years supervised release, a $250,000 fine, and a $100 special assessment.

I further state that I am a(n) ____ICE Special Agent____ and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

Approved
As To
Form: Kevin J. Barry
AUSA

Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

February 11, 2009
Date

at San Francisco California
City and State

Hon. Maria-Elena James, United States Magistrate Judge

Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Dennis Scheffel, declare the following:

## I. INTRODUCTION AND BACKGROUND

1. I am a Special Agent with the U.S. Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), assigned to the Office of the Special Agent in Charge, San Francisco, California. I am currently assigned to the Human Smuggling and Benefit Fraud Unit in the San Francisco District Office and have conducted federal investigations since May 2004. I have received formal training in detecting counterfeit immigration and identity documents, and have experience in investigating cases involving identity theft, alien harboring, financial investigations, asset forfeiture procedures, money laundering, and other efforts to improperly gain immigration benefits. I am familiar with the various types of counterfeiting and smuggling schemes commonly employed by those who use forged documents to gain entry to the United States and to obtain employment or benefits to which they are not entitled.

2. As part of my duties as an ICE Special Agent, I investigate and prepare cases for prosecution involving illegal alien entry and re-entry, criminal aliens, immigration benefit fraud, smuggling, transportation, harboring, and employment of illegal aliens, and money laundering. I have been involved in the successful prosecution of illegal alien entry and re-entry cases, as well as money laundering investigations relating to the harboring of illegal aliens.

3. I make this affidavit in support of a criminal complaint against Frank Salvador SOLORZA, charging him with one (1) count of impersonation of a federal officer, in violation of 18 U.S.C. §912.

4. Title 18, United States Code, Section 912 provides as follows:

*Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both.*

5. The information contained in this affidavit is known to me through personal knowledge and information received from other law enforcement personnel. This affidavit is based upon my training and experience as an ICE agent and that of other ICE agents and law enforcement personnel with whom I have discussed this matter.

6. As this affidavit is being submitted for the limited purpose of supporting a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have instead set forth facts that I believe are sufficient to establish probable cause for the Court to authorize a criminal complaint against Frank Salvador SOLORZA.

1

## II. FACTS ESTABLISHING PROBABLE CAUSE

7. On February 4, 2009, ICE Special Agent (SA) Gricelda Garcia received a telephone call from V.S., who claimed that she received a threatening message on her home phone's answering machine. V.S. also added that an unknown Hispanic male appeared at her residence on February 2, 2009 and gave her husband, R.E., a letter that appeared to be from an Immigration Official that works for the San Francisco office. V.S. told SA Garcia that other family members were also visited by this same unknown Hispanic male. SA Garcia arranged to meet with V.S. and the additional family members the following day to conduct an interview.

8. On February 5, 2009 ICE SA Garcia, ICE SA Jason Barry, and I met with V.S. and five other family members at the residence of I.E. and G.E., an unmarried couple. Other family members were present. The family members provided ICE agents with four letters from "George Marsino, Immigration Officer," who states that he works for the "Office of Immigration of San Francisco." Each of these typed letters is identical, with the exception that each family member's name is also written with a blue ink pen on the top of the page. The signature for "George Marsino" also appears on all four letters with a blue ink pen. The bottom of the letter, in the form of letterhead, has the address "444 Washington Street, San Francisco Ca, 94111." This is the address of the U.S. Citizenship and Immigration Services San Francisco field office.

9. The letters are dated December 22, 2008 and addressed to all six family members, "Mr. & Mrs. R.E., Mr. & Mrs. G.E., J.R.E., & J.E." The author of the letter claims that he works for the "Office of Immigration of San Francisco" and has been reviewing their immigration files. The author states that he has noticed that the addressees have provided false information in their applications for permanent residence. The author states that he is the person that reviews these applications, and when something is wrong, he "can fix it." He claims that the addressees' applications are in his office and they have two weeks to have the applications corrected. He adds that if they do not "take care of this problem" in the time that he has given them, they will go to jail "in excess of three to five years" and following that, they will serve an additional "three to five years for immigration fraud," and subsequently be deported to Mexico. He instructs them to pay $15,000 for each husband and wife pair and $10,000 each for J.E. and J.R.E. He states "upon receipt of payment I will correct and problems [sic] and process your applications and your papers will be good forever." He adds, "If you don't pay that, the police will come and find you for fraudulent information to the United States Government."

10. **Contact with J.E.** J.E. stated that on February 2, 2009, an unknown Hispanic male (UHM) showed up at his residence. The UHM approached the side door of the house and asked for J.E. by name. J.E. described the UHM as being approximately forty years old, around 5'10" tall, a little fat around the waist, thin mustache, and was wearing work clothes, which included a thick jacket, and work shoes. The UHM handed J.E. the letter referred to in paragraph 9 with "J.E." handwritten on the top of the letter in blue ink. The UHM also brought with him a small, black tape player/recorder and played a recording for J.E., in which the voice on the recorder discussed the same issues as the letter.

11. **Contact with R.E. and Family**. R.E.stated that on February 2, 2009, at approximately 6:30 PM, a UHM showed up at his residence. R.E.'s ten year old child answered the door. The

2

UHM asked the young boy if his dad was named "R." and the child let the UHM inside of the house. The UHM provided a R.E. with a copy of the letter referred to in paragraph 9, addressed to R.E., explaining that it was for him. The UHM asked R.E. if he "had any papers." R.E. provided a similar description of the UHM, who was also dressed in work clothes, like a construction worker. The UHM told R.E. that he needed his phone number. The UHM told R.E. that he would be receiving a phone call related to what was shown on the letter. The UHM also left another copy of the letter referred to in paragraph 9 that had "J.R.E." written in blue ink at the top of the letter. The UHM told R.E. to give that letter to J.R.E. The UHM also played a recording for R.E. R.E. described the voice as sounding like a Caucasian man that didn't speak Spanish fluently. The voice on the recorder discussed the same issues as the letter.

12. V.E., the wife of R.E., stated that on or around February 3, 2009, a voicemail was left on her answering machine at her residence. V.E. was able to record the message onto a microcassette tape and provided it to ICE agents on February 5, 2009.

13. ICE SA Rocio Franco listened to the February 3, 2009 voicemail recording, which was spoken in the Spanish language, and she was able to translate and summarize parts of the recording. Due to the poor quality of the tape, SA Franco was unsure if the caller was male or female. As could be translated at the time, in essence, the caller stated that the message was for R.E. The caller added that the person from Immigration will be out for a month and his/her last day is Friday. The caller stated that they have until Friday to turn in the money, that if they don't turn in the money by Friday, nothing will be able to be done. Furthermore, the caller stated that "if they don't have the money, to try and get it. If not, [they] are going to lose [their] family." The caller talked about a family that didn't pay the money and went to jail and lost their girls and boys. The caller added "have the money, the man will only be there until tomorrow." The caller also stated "you are going to be reported, you are going to go to jail; you will lose your kids." The caller stated that "the man" sent them a letter and that the letter guarantees that he will not "rob" them, that he will 100% fix their papers. The caller added that if it's not fixed, the E. family will be reported and that "this is not a game."

14. **Contact with G.E. and Family**. G.E. and his wife, I.E., stated that on February 2, 2009, at approximately 8:30 PM, a UHM showed up at their residence. I.E. answered the door and met a UHM that called himself "J.E.." The UHM told I.E. "I have this for you," and handed her a letter. The letter was a copy of the letter referred to in paragraph 9, addressed to Mr. & Mrs. G.E. I.E. allowed the UHM inside of the house, thinking that this man was a friend of her husband, G.E. G.E. came into the main room and met the UHM and asked his wife if she knew him. The UHM told G.E. and I.E. that "they just sent me." The UHM also played a recording for I.E. and G.E. They described the UHM as being approximately 5'10" tall, having a little belly, dark reddish hair, thin mustache, fair skin, approximately 150 pounds, wearing work attire, which included a light brown jacket, and a belt buckle that read "Los Altos." G.E. and I.E. told the UHM to get out of the house and chased the man away. The UHM appeared to run away on foot towards the main street.

15. **Contact with J.R.E.** J.R.E. stated on February 2, 2009, at approximately 5:00 pm to 5:30 pm, he noticed two UHMs dressed in work attire show up at the front door of his old apartment, which is upstairs from his most recent residence.

3

16. G.E. and R.E. told ICE agents that they suspected relatives may be involved in these threatening acts. One cousin, in particular, a Salvador Solorza-Escatel (this is another name for Frank Salvador SOLORZA), who lives on Spring Street, in Redwood City, CA was a person that they first mentioned. They recall SOLORZA oddly asking them, as recent as two weeks ago, about when their "green cards" were going to expire.

17. At approximately 8:58 pm on February 5, 2009, while ICE agents were interviewing the E. family, J.E. received a phone call on his cell phone. The call did not show the number on the "Caller-ID." J.E. alerted ICE agents as the phone call came in and ICE agents were able to consensually record and monitor the conversation.

18. ICE SA Gricelda Garcia later listened to the recording, which was spoken in the Spanish language and was able to translate and summarize parts of the recording. As could be translated at the time, in essence, the unknown voice (UV) told J.E. that "Immigration is going to come get you. We are going to pick up the money at J.E.'s house. You and your family get together and gather the money. The dude from San Francisco who is fixing your paperwork working with Immigration will be picking up the money. I don't need to tell you his name, they're fixing everything for you properly; everything is going well for you. We are trying to do this the right way; we don't want to have any problems. ...If you don't want to have any problems with your family and possibly lose your papers, everything is going well, if you don't want to do things right we are going to have to use....we are going to have to use other things....The money must be ready tomorrow before 4:00 pm, I'm going to call you to have the money ready, we're giving you 'til tomorrow if you don't have all the money together, you're going to have other problems on Monday." J.E. told the UV that he would need some more time to gather the money and asked the UV if he can have until sometime next week. The UV told J.E. that he would have to call him back. The UV told J.E. "I think the latest we can give you is possibly Tuesday, that's what I think but maybe the guy can give you a week to get the money together. I'll call you back."

19. At approximately 9:11 pm the same evening, the UV called J.E. back on J.E.'s cell phone. ICE SA Garcia later listened to the recording of this phone call and was able to translate and summarize parts of the recording. The UV told J.E. that he is getting until Tuesday to gather the money. The UV stated, in essence, as could be translated at the time, "he leaves on vacation tomorrow, the guy who is fixing your stuff over there with Immigration so he's giving you until Tuesday to gather the cash. He is going exclusively to fix you papers and after that you'll never have any problems. He is doing things right. He says you guys have taken too long. He is fixing things legally. You know he's on the inside. You, out here (on the outside) can't do anything. You don't know him, you don't even know us. We'll look for you. On Tuesday I'm going to call you. I will do everything don't worry. Just have the money on Tuesday before 4 p.m. On Tuesday I will call you and tell you where we will meet with the money. I will take care of everything. Don't worry about finding me I know where to find you. I know where all of you live. ....All the money must be together in a suitcase. Just one. We don't want two or three suitcases. We just want one. ....Okay you are giving me your word. I will only call you. If anything happens I will...I know your cousins and nephews I'm not sure how they are related to you, a couple with two kids and all that... I will get a hold of you on Tuesday; you have until

4

Tuesday to gather the money, please. Before 4:30 p.m." J.E. told the UV that he has to go to work on Tuesday. The UV asked J.E. what time he got off work. J.E. told the UV that he will be back at his house by 4:30pm. The UV told J.E. that he will be at J.E.'s house at 4:30 p.m. The UV added, "I'm not going to tell you who I am or how to identify me. I will call you and tell you what you need to do. Until then you don't do anything. Don't think I'm going to give you my phone number so you can go to the police. I'm giving you until Tuesday before 4:30 p.m. I'll be calling you starting about 3:30 to make sure you have the money. Tell your family. You've asked me to only call you. Alright then." SA Garcia added that throughout the conversation the UV called J.E. "cous'" and used a threatening and defiant tone.

20. On February 9, 2009, I received subpoena results on phone subscriber records and toll records for phone numbers of interest. The records reveal that the incoming phone calls that were made to the cell phone of J.E., (650) XXX-XXX at 8:58 pm and 9:11 pm, were made by phone number (650) 520-3125. The subscriber records reveal the subscriber as "Yolanta Solorza," the wife of Frank Salvador SOLORZA.

21. Additional phone toll research has revealed several outgoing phone calls being placed from (650) 520-3125 to the home phone number of V.E. and R.E., (650) XXX-XXXX, from February 4, 2009 through February 8, 2009.

22. On February 9, 2009, J.E. notified me that he received another phone call from an UHM on February 7, 2009, at approximately 8:50 pm. Among other things discussed, J.E. informed me that the UHM told him that on Tuesday, February 10, 2009, there will be three people in the area of J.E.' house during the time of the money pick-up. The UHM told J.E. that the man that delivered J.E. his letter will be the same person that will be picking up the money in the suitcase on Tuesday at 4:30 pm. The UHM also told J.E. that there will be two other people that will be covering both ends of the street to watch things and make sure things appear normal.

23. I have conducted phone toll analysis on the phone call that was received by J.E. on February 7, 2009, at approximately 8:50 pm, which revealed that (650) 520-3125 was the number used to call J.E. The subscriber records reveal the subscriber as "Yolanta Solorza," the wife of Frank Salvador SOLORZA.

24. On February 10, 2009, ICE SA Micheal Simpson, ICE SA Rocio Franco, and I met with J.E. at his residence. At approximately 3:45 pm, a UHM called the cell phone of J.E., while ICE agents monitored and recorded the conversation. The UHM inquired if J.E. had the money requested and provided instructions to J.E. as to where to place the briefcase with the money. The UHM told J.E. that the person that will be picking up the money will not be the same person that gave him the letter. J.E. told the UHM that the money will be in a briefcase. The UHM told J.E. that there will be two people on both ends of the street and there will be one person coming near the front of the house to collect the briefcase. The UHM told J.E. that the man that will be coming to pick up the briefcase will be dressed in a clown suit and will be riding a small bicycle. This call ended at approximately 3:51pm.

25. At approximately 4:01 pm, an UHM, who sounded like the same UHM that called J.E. minutes ago, called J.E. again with more instructions. This call was also monitored and recorded by ICE agents. The UHM was using a device to disguise his voice during this phone call. The

5

UHM told J.E. that the man will be out front in just a minute or two. This call ended at approximately 4:05 pm.

26. At approximately 4:15 pm, SA Rocio Franco and J.E. waited near the doorway for the person to appear in front of the house. Approximately a few minutes later, a man dressed up in a clown suit appeared, riding a bicycle, in front of the house. The man dressed in the clown suit, who was later identified as **Frank Salvador SOLORZA**, engaged in conversation with SA Franco and J.E. for approximately fifteen seconds. SA Franco and J.E. told Frank Salvador SOLORZA that the money was inside the briefcase. SA Pat Jones and SA Bill Eason were watching the exchange from across the street and noticed that SOLORZA appeared to have waved back at someone towards the corner of Palm and Oxford Street just seconds after arriving in front of J.E.'s residence. After a brief discussion in the front yard, SOLORZA grabbed the briefcase, and ICE agents then detained and arrested Frank Salvador SOLORZA. ICE agents brought SOLORZA inside of the residence shortly after the area was secure.

27. At approximately 4:30 pm, ICE SA Simpson, ICE SA Franco, and I began to interview Frank Salvador SOLORZA after he was advised of his Miranda rights and signed a written waiver. He confirmed his identity as Frank Salvador SOLORZA. A cell phone with phone number (650) 520-3125 was found on him at the time of arrest. Items that were found on him at the time of his arrest included two receipts dated February 9, 2009 and February 10, 2009 from the "House of Humor," located at 747 El Camino Real, Redwood City, CA, car keys, and a pair of sunglasses with reflective lenes.

28. Frank Salvador SOLORZA told ICE agents that he was told to pick up this money by three other persons that he knows only by their nicknames; Zora, Pelon, and Chino. SOLORZA claimed that these people are Norteno gang members in the Redwood City area. SOLORZA does not know their real names or where they live. SOLORZA stated that around one month ago he was initially was approached by one of them at a nearby park where his son plays soccer. SOLORZA believes that these three people are somehow connected to "the lady" that "fixes" immigration papers. SOLORZA claimed "the lady" was the one that "fixed" the papers for the entire E. family.

29. SOLORZA claimed that these three people would frequently meet with him in front of his house and use SOLORZA's cell phone. SOLORZA told ICE agents that his cell phone number is (650) 520-3125. SOLORZA claimed that Yolanta SOLORZA, his wife, has never met these people before. SOLORZA could not provide a name of anyone else that may know the names of these people. SOLORZA does not have any of their phone numbers. SOLORZA claims these three people also directed him where to park and when to drive up towards the residence in the clown suit driving a bicycle. They told him that once he received the money, he was to throw the bag in the window of the car passing by. SOLORZA claimed the three people were driving a red Nissan and a blue Toyota. SOLORZA admitted that he has known about this plan to obtain money from the E. family for a few weeks. SOLORZA claimed that "Pelon" and "Chino" told him about the "letters." SOLORZA claimed the "letters" stated that Immigration will fix their papers. SOLORZA confirmed that one letter went to each person, hand delivered by "these guys." SOLORZA stated that no one actually works for Immigration.

6

30. I showed SOLORZA a copy of the letter that J.E. received from "George Marsino," referred to in paragraph 9. I asked SOLORZA if that letter was the kind of letter that went out to the other family members. SOLORZA confirmed that he has seen these letters before. SOLORZA claimed that he previously saw "a whole bunch" of them, adding that Chino had them in an envelope.

## CONCLUSION AND REQUEST TO SEAL

31. Based on the foregoing, I submit that there is probable cause to believe that Frank Salvador SOLORZA committed one (1) count of impersonation of a federal officer, in violation of 18 U.S.C. §912 and aided and abetted others in that violation. I therefore request that the Court approve this criminal complaint for Frank Salvador SOLORZA.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 11th day of February 2009, at San Francisco, California.

**Dennis Scheffel, Special Agent**
**Immigration and Customs Enforcement**
**U.S. Department of Homeland Security**

**Subscribed and sworn to before me this 11th day of February, 2009.**

**The Hon. Maria-Elena James**
**United States Magistrate Judge**
**Northern District of California**

7

hi

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☑ COMPLAINT ☐ INFORMATION ☐ INDICTMENT
☐ SUPERSEDING

**OFFENSE CHARGED**

18 U.S.C. Section 912
18 U.S.C. Section 2

☐ Petty
☐ Minor
☐ Misde-meanor
☑ Felony

PENALTY:

Maximum 3 years in prison, 3 years supervised release, $250,000 fine, and $100 special assessment.

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA

**DEFENDANT - U.S.**

FRANK SALVADOR SOLORZA

**DISTRICT COURT NUMBER**

**PROCEEDING**

Name of Complaintant Agency, or Person (&Title, if any)
Immigration and Customs enforcement, Special Agent Dennis Scheffel

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of: **SHOW DOCKET NO.**
☐ U.S. Att'y ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant **MAGISTRATE CASE NO.**

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person
Furnishing Information on **THIS FORM** Joseph P. Russoniello

☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y
(if assigned)

**DEFENDANT**

**IS NOT IN CUSTODY**

Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons was served on above charges

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☑ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges } ☐ Fed'l ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes ☐ No } If "Yes" give date filed

**DATE OF ARREST** 2/10/2009 Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** Month/Day/Year

☐ This report amends AO 257 previously submitted

**ADDITIONAL INFORMATION OR COMMENTS**

PROCESS:
☐ SUMMONS ☑ NO PROCESS* ☐ WARRANT Bail Amount:

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:

Before Judge:

Comments: