Frank Bell, State Bar No: 38955
A Law Corporation
333 Bradford Street Ste. 270
Redwood City, CA 94063
Tel:  650 365-8300; Fax:  650 366-8987
Email:  FrankBell@FrankBellLaw.com

Attorney for Defendant
FRANK SALVADOR SOLORZA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FRANK SALVADOR SOLORZA,<br><br>Defendant.<br>_____/ | NO:  CR-09-0217 PJH<br><br>POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S PROPOSED JURY INSTRUCTION ON COERCION<br><br>Date: June 2, 2010<br>Time: 2:30 p.m.<br>Judge: Hamilton |
|---|---|

Defendant submits the following points and authorities in support of the requested jury instructions (Ninth Circuit Model 6.5 and/or 6.6) as In Limine Motion No. FIVE:

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

<u>I. INTRODUCTION</u>

On February 10, 2009, defendant FRANK SALVADOR SOLORZA was arrested. He was initially charged in a Complaint with one count of impersonation of a federal

**IN LIMINE NO. FIVE**                                                                                                        Page -1-

officer (18 U.S.C. Section 912). Later, on February 26, 2009, an Indictment was obtained charging three counts. Count One was Conspiracy in violation of 18 U.S.C. Section 371. Count Two charged Impersonation of a Federal Officer in violation of 18 U.S.C. Section 912 and Count Three charged Aiding and Abetting Attempted Extortion by a Federal Officer in violation of 18 U.S.C. Section 872. Subsequent to the original Indictment, on October 22, 2009, a Superseding Indictment was returned charging Solorza with multiple counts of Conspiracy (Count One-18 U.S.C. Section 371), Impersonation of a Federal Officer (Counts Two and Three -18 U.S.C. Section 912) and Attempted Extortion by a Federal Official (Counts Four, five, Six and Seven-18 U.S.C. Section 872).

The charges result from an investigation by ICE agents who had been informed in early February 2009 by the Escatel-Conchas family that unknown suspects were attempting to extort $50,000 from them with threats of jail time and deportation. Defendant was arrested when he approached the house of one of the victims. Immediately after the arrest he told agents that he was threatened and coerced by the perpetrators and he makes this motion for a duress instruction based on the following facts and law.

## II. STATEMENT OF FACTS/OFFER OF PROOF

Defendant, FRANK SOLORZA, will testify in the matter. Other witnesses will be called by the defense. The testimony will be as follows. Solorza is married and has four children, three young daughters and one young son. In late January, 2009, defendant was on Roosevelt Street, at Red Morton Park, in Redwood City, with his children who were playing soccer. While he was there a man approached him and asked if he knew the man to whom he had been talking, his cousin "Beto." Defendant replied that he was his cousin. The man asked if he was an "Escatel" too and defendant replied that he was a "Solorza" The man asked if defendant wanted his papers "fixed" too. Defendant stated that he was a U.S. Citizen and did not need this persons help.. The man followed defendant to his car.

**IN LIMINE NO. FIVE** <span style="float:right">Page -2-</span>

The man saw defendant's son and commented, "This is your boy, huh?" He also looked over to defendant's car and remarked how it could really get "messed up."

The following day three people, going by the name's "Zora", "Pelon", and "Chino," confronted defendant at his home. They claimed to be East Redwood City Nortenos. They showed defendant a long list of names and they pointed to a name at the top of the list, Jesus Garza. Defendant also saw his brother "Lorenzo" and his sister "Lupe" on the list and they said that these people would all be deported if they did not get their papers fixed. They said "we know your kids" and they told him he needed to help them out. After tying a red bandana to the steering wheel of defendant's truck they explained that when they saw his car they would come by to talk with him. Initially, they said, they just want to use his phone.

Later, they were constantly pressuring him and they made constant threats to his family if he did not cooperate. These individuals then began to meet with defendant, choosing when to arrive. They were often unannounced. Initially they forced defendant to change his cell phone settings so as to block the caller identification of outgoing calls. They would take his cell phone and use it to make phone calls to people unknown to the defendant. These calls were made speaking in Spanish and sometimes using a device to disguise their voice.

Defendant never saw a gun but at least one person threatened with him with a knife while defendant was at work. This was witnessed by two or three individuals who worked with defendant.[1]  On another occasion persons matching the description of the gang members came to defendant's work and asked if defendant was at work, using foul language and they were threatening in their demeanor.

---

[1] Defendant has provided the government with the statements of two of these individuals. There may be others who saw people at his work or at his house and neighborhood. Investigation is continuing.

**IN LIMINE NO. FIVE**                                                                                              Page -3-

Defendant reluctantly agreed to let them use his cell phone to make calls . Often they would use the phone out of his hearing "If you go to police we will find out and your wife and kids will go down," was the type of threat they would make. Defendant felt trapped in a box   He worked 3 nights a week from 10:00 p.m. until 7:00 a.m.  They were aware of his work schedule and came by his work.  His wife worked full time, Monday through Friday, at a law firm in San Mateo.  Defendant did not feel that the police could protect him, or his family, from these people.

Defendant was aware of gang members in the Bay Area retaliating against individuals or their families for cooperating with the police . The Government's own investigation in consultation with the Gang Intelligence Unit of the San Mateo County Sheriff's Department (Det. Gabriel Huerta, Badge No. 855) revealed that defendant was correct when he stated that Nortenos are prevalent in the area of Roosevelt Park and Red Morton Park in Redwood city and that Nortenos "claim" the parks.  In addition, the Gang Unit revealed that one of the names used by the persons who confronted defendant, i.e. "Pelon," was a name known to the Gang Unit and generally matched the description given by the defendant to ICE at the time of his arrest.

Sometime before Feb 10, 2009 they told him they wanted him to pick up a "package" somewhere in Redwood City.  He told them he didn't want to do this and he reminded them about their promise that all they wanted was to use the phone a few times and then they would leave him alone.  They told him that "We will tell you when your done."

During the above noted confrontations with the three individuals, defendant was told that if he didn't cooperate someone in his family would "go down,." which meant to him that they would be seriously injured or even killed.  "We know where your children play." "We know where you live." "We know where you work." "There are a lot of us

**IN LIMINE NO. FIVE**                                                                                                          Page -4-

and we will be watching you around the clock." "Don't go to police because we will get your kids." These were the common threats and threads of the threats.

The morning of February 10, 2009, "Pelon" came alone to defendant's home and told him that he would be picking up a "package" later that day. Later that day, using a device to disguise his voice, "Pelon" made two calls on defendant's cell phone. Solorza drove his wife's car to take his daughter to her soccer practice. He was followed by the gang members. After dropping off his daughter defendant was told where to park and to put on a previously purchased clown costume. He rode a little bicycle to a particular house. He was told to pick up a "suitcase" that would be left for him. Once he had the "package" he was told to throw it into a car of theirs as they passed by. He was told they would wait on the corners of the street so as to make sure he followed their instructions. When they got the "suitcase" they would leave him alone.

Defendant then rode the bicycle over to the house. Upon arriving he saw an unknown person, accompanied by his cousin, Jesus Escatel, with the "suitcase." He was shocked to see his cousin. He then waved to the gang members to signal he was not going to carry out what they had asked of him. At this point the unknown man communicated that he was an undercover ICE agent and place defendant under arrest.

Defendant files this motion for a duress jury instruction, No. 6.5 and/or 6.6 of the Manuel of Model Criminal Jury Instructions for the Ninth Circuit. For the reasons discussed below, the court should grant the motion.

### III. ARGUMENT

There are three elements of the duress defense: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm. *Contento-Pachon 723 F. 2d 694 (9th Cir. 1984)*.

**IN LIMINE NO. FIVE**                                                                                          Page -5-

The element of immediacy requires that there be some evidence that the threat of injury was present, immediate, or impending. *Contento-Pachon, 723 F. 2d 694*. In *Contento-Pachon* the defendant was a Colombian taxi-driver who was proposed a job by a Jorge to swallow cocaine-filled balloons and transport them to the United States. *Contento-Pachon, 723 F. 2d 693*. Contento-Pachon told him no. In response, Jorge mentioned facts about Contento-Pachon's personal life, including private details, which Contento-Pachon had never mentioned to Jorge. Jorge told Contento-Pachon his failure to cooperate would result in the death of his wife and three year-old child. After the second time threatened Contento-Pachon agreed to cooperate. The courts believed that the defendant was dealing with a man deeply involved in the exportation of illegal substances. *Contento-Pachon, Id*. That large sums of money were at stake and, consequently, Contento-Pachon had reason to believe Jorge would carry out his threats. Jorge had gone to the trouble to discover that Contento-Pachon was married, that he had a child, the names of his wife and child, and the location of his residence. The courts found these were not vague threats of possible future harm. *Contento-Pachon, Id*.

Here Mr. Solorza is sought out by gang members looking to "hire" him. They find him at a public park, they identify his child and mode of transportation, they find where he lives often stopping by unexpectedly. They have invested time and money into a high-risk plan, with a significant payout. They have the capability of carrying out their threats immediately and at any time.

The essential nature of Mr. Solorza's action's under duress support his "well grounded fear that the threat would be carried out". *Contento-Pachon 723 F. 2d 694 (9th Cir. 1984)*

Mr. Solorza lacked a reasonable opportunity to escape the threatened harm. The opportunity to escape must be reasonable. *Contento-Pachon 723 F. 2d 694*. In *United States v. Otis, 127 F. 3d 829, 835 (9th Cir. 1997)*, Monsalve was one of seven defendants

**IN LIMINE NO. FIVE**                                                                 Page -6-

convicted of various conspiracy, money laundering, and gun crimes. Monsalve's testimony established that he lost $300,000 of the Cali cartel's money. The cartel did not believe this and kidnapped his father in Columbia and only agreed to release him if Monsalve worked for them in the U.S. The government argued that Monsalve could have escaped by cooperating with the American authorities. The appeals court did not see how police protection would have protected his father in Columbia. The appeals court found Monsalve should have received a duress instruction. *Id.*

Here, the people threatening harm to Mr. Solorza also threatened harm to Mr. Solorza's immediate family. They knew what his young children looked like. They had been to where he and his wife and children lived. If Mr. Solorza was to go to the authorities, this protection may not have protected his family. The trier of fact should decide whether one in his position might believe that…reporting the matter to the police did not represent a reasonable opportunity of escape. *Contento-Pachon 723 F. 2d 694.*

## IV. CONCLUSION

For the reasons set forth above, Mr. Solorza has sufficiently established a showing to support a duress defense and makes a motion for the duress jury instruction.

Dated: May 18, 2010                                             Respectfully submitted,


_____
FRANK BELL
Attorney for Defendant,
FRANK SALVADOR SOLORZA

IN LIMINE NO. FIVE                                                                             Page -7-