BARRY J. PORTMAN
Federal Public Defender
JEROME E. MATTHEWS
Assistant Federal Public Defender
555 12th Street, Suite 650
Oakland, CA 94607-3627
510-637-3500 (phone)
510-637-3507 (fax)

Counsel for Defendant FRANK SALVADOR SOLORZA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>FRANK SALVADOR SOLORZA,<br><br>　　　　　Defendant. | No. CR 09 - 00217 PJH<br><br>**FRANK SOLORZA'S SENTENCING MEMORANDUM**<br><br>**Date: April 20, 2011**<br>**Time: 2:30 p.m.** |

**1. Preliminary Statement**

　　Defendant Frank Solorza was convicted of conspiracy, impersonating a federal officer and extortion, following a jury trial which began on June 21, 2010. On April 20, 2011, he will stand before the Court for sentencing.

　　Mr Solorza asks the Court to impose a sentence of five years probation. A sentence of probation takes into account some of the predominant concerns in this matter, and insures that Mr Solorza's children – each of whom is utterly innocent of any wrongdoing – do not lose the love, support and companionship of their devoted father. The Court will find ample support – statutory,

precedential and from the Department of Justice itself – for such a sentence. As explained more fully in this memorandum, it also is the right result.

**2. Post-Trial Issues**

Because the Court appointed the Federal Public Defender after the jury returned its guilty verdicts, current defense counsel did not have the opportunity to view the proceedings. There does appear to be one possibly fatal flaw, however, to the jury's verdict. Based on defense counsel's review of the trial transcript, it does not appear that the jury was polled as to whether they unanimously rejected Mr Solorza's affirmative defense of duress.

This is not merely an academic concern. In *United States v. Southwell*, 432 F.3d 1050 (9th Cir. 2005), the Ninth Circuit decided a case of first impression regarding affirmative defenses: What happens when the jury fails to agree on whether an affirmative defense excuses the charged conduct? The court considered this question in the context of an insanity defense to a charge of arson. During deliberations, the jury sent a note to the district court asking if they could find the defendant guilty if they didn't unanimously agree that the defendant was sane or insane. The district court, over defense counsel's objection, didn't directly respond to the question and told the jury that only one unanimous verdict could be returned. The jury returned a guilty verdict. 432 F.3d at 1052. The Ninth Circuit reversed, holding that "[s]ince a jury verdict must be unanimous, a jury united as to guilt but divided as to an affirmative defense . . . is necessarily a hung jury." *Id.* at 1055. Because the jury wasn't polled to determine whether they were unanimous as to both guilt and sanity, the record could not support the judgment of conviction. *Id.* at 1055-56.

Whether there is a pre-sentence remedy available for this error is another question, but defense counsel feels duty-bound to bring this matter to the Court's attention.

**3. Objections to PSR**

¶ 24. Mr Solorza believes that the record does not merit a vulnerable victim enhancement. USSG §3A.1.1 permits a two-level upward adjustment to the offense level "where (1) a victim was either (a) unusually vulnerable due to age, physical or mental condition, or (b) otherwise particularly susceptible to the conduct, and (2) the defendant knew or should have known of such vulnerability or susceptibility." *United States v. Castellanos*, 81 F.3d 108, 110 (9th Cir. 1996) (holding that victims could not be unusually susceptible to defendant's scheme simply by virtue of being Spanish-speakers or Hispanic individuals). To determine whether a victim is particularly susceptible to the defendant's criminal conduct, the court may consider the "characteristics of the defendant's chosen victim, the victim's reaction to the criminal conduct, and the circumstances surrounding the criminal act." *United States v. Peters*, 962 F.2d 1410, 1417-18 (9th Cir. 1992). That a class of victims may statistically be more likely to fall prey to a defendant's crime is not enough to render the class particularly susceptible to the criminal conduct. *Castellanos*, 81 F.3d at 111 (noting that "[e]specially in cases involving some kind of scheme to defraud, the criminal will typically direct his activities toward those persons most likely to fall victim to the scheme."). Victims to whom § 3A1.1 applies must be people "who are in need of greater societal protection" and "are the persons who, when targeted by a defendant, render the defendant's conduct more criminally depraved." *Id.*

The foregoing factors militate against application of the vulnerable victim enhancement in this case. At the outset, the victims in this case did not react in a manner consistent with persons who were at all susceptible to criminal conduct. Jesus Escatel testified that he and his cousins notified ICE agents approximately 2 days after February 2, 2009, the date they received the demand letters. By February 5, 2009, they were meeting with ICE agents in Mr Escatel's home. *See*

Declaration of Jerome E. Matthews "Matthews Decl.," Exhibit A, 320:23 - 321:2.  The record makes clear that Mr Escatel and his relatives already had been questioned by ICE investigators regarding their green card applications, and that in 2004 the Escatels had admitted that their applications contained material misstatements, placing them at risk of losing legal permanent resident status. *Id.*, 320:14-18; 376:12-21.  Yet shortly after receiving the demand letter, they notified ICE agents of the scheme.  Such a rapid meeting with the very agency that would be charged with initiating deportation proceedings not only belies the fear of government action that might otherwise make an illegal immigrant vulnerable, but also demonstrates that none of the victims found the scheme at all credible.

Ramon Escatel's testimony similarly demonstrates why the enhancement is inapplicable.  He testified that immediately upon receiving the demand letter on February 2, 2009, he knew it to be a fraud, and that immigration would not send an unsealed letter. *Id.*, 431:21-25; 483:2-7.  He also testified that he believed the defendant had orchestrated the whole scheme because of a previous encounter between the defendant and Jose Rutilio, Mr Escatel's brother. *Id.*, 455:11-17.

So too with respect to Irma Escatel's reaction to the scheme.  She testified that not only was she angered at receiving the February 2, 2009 demand letter, but also that she thought Bertina Frost was attempting once again to extort money from the family. *Id.*, 530:16-21.  Far from fearing any reprisal from immigration or anyone else, she chased the messenger who had delivered the letter out of her house. *Id.*, 530:22 - 531:7.  Further, she stated that one of the voice messages demanding money that was left on her relative's answering machine sounded suspiciously like Ramona, Mr. Solorza's sister. *Id.*, 549:11-15.  A vulnerable victim?  Unlikely.

The probation officer notes that the victims are illegal immigrants, and therefore vulnerable

due to their status. The trial transcript, however, suggests the opposite. Both Jesus and Ramon Escatel testified that ICE representatives previously had informed them that their permanent resident status was not in jeopardy in spite of Bertina Frost's fraudulent representations. *Id.*, 377:9 - 378:11; 503:13 - 504:5.

In sum, the collective "reaction to the criminal conduct, and the circumstances surrounding the criminal act," *Peters*, 962 F.2d at 1417-18, speak volumes. The victims disbelieved that the immigration authorities were behind the extortion demands; even if they at some point believed their resident alien status was at risk, they collectively decided to contact ICE agents to report the extortion attempts and obtain their assistance; and, at least two of the victims believed that Mr Solorza was orchestrating the scheme with the assistance of his sister. These scarcely are persons "who are in need of greater societal protection." *Castellanos*, 81 F.3d at 111. The offense conduct was, charitably described, an ill-conceived, unsophisticated and pathetically executed attempt to obtain money. It fooled no one. The Court should decline to impose the vulnerable victim enhancement.

¶ 27. Mr Solorza believes he is entitled to an adjustment for acceptance of responsibility. In this circuit, a defendant may take a case to trial, assert a defense of duress, and still receive the adjustment provided he does not dispute the factual elements of the offense. *See United States v. Gamboa-Cardenas*, 508 F.3d 491, 504-06. (9th Cir. 2007) (district court appropriately granted reduction for acceptance of responsibility to defendant who asserted duress defense at trial but admitted responsibility for conduct in statements before trial and during trial).

The essential elements of the charged statutes, 18 U.S.C. §§ 371, 872 and 912, collectively are entering into an agreement to impersonate a federal official and, through means of extortion,

obtain money. Here, Mr Solorza spoke with agents following his arrest. He admitted that he had knowledge of the ersatz immigration letters sent to the Escatels; he admitted that it was he who rode to the Escatel residence on a bicycle wearing a clown suit, he admitted that the purpose of him going to the Escatel residence was to collect money that reportedly was to be used to fix immigration papers. Matthews Decl., Exhibit B. Having admitted the essential elements of the offenses during his post-arrest interview, Mr Solorza was permitted to assert the defense of duress at trial without losing an adjustment for accepting responsibility.

¶ 31. Mr. Solorza questions whether USSG §2C1.1 is applicable to this case. While the extortion statute, 18 U.S.C. § 872, appears to cover the conduct of which he was convicted, namely representing himself to be a federal official, it is less clear whether this Guidelines section or its specific offense characteristics should apply. The Guidelines specifically state that §2C1.1 applies to

> a person who offers or gives a bribe for a corrupt purpose, such as inducing a public official to participate in a fraud or to influence such individual's official actions, or to a public official who solicits or accepts such a bribe.

§2C1.1, Background, p. 131 (2010). In addition, §2C1.1's base offense level incorporates an adjustment for abuse of a position of trust. *See* §2C1.1, Application Note 6. Mr Solorza did not bribe anyone, he is not a "public official" as defined in 18 U.S.C. § 201(a)(1) or Application Note 1 to the Part C guidelines, and he did not stand in a position of trust with the victims in this case.

Defense counsel is not aware of any published Ninth Circuit decision upholding application of §2C1.1 to a defendant who merely impersonated a public official, but a decision from the Seventh Circuit is instructive. In *United States v. Abbas*, 560 F.3d 660 (7th Cir. 2009), on facts similar to those here, the court found that the district court incorrectly applied the §2C1.1 guidelines to a defendant who impersonated an FBI agent in order to induce immigrants to pay him money in

exchange for making their immigration problems disappear. The district court there – as the probation officer requests this Court to do – looked at the impersonation of a federal officer guidelines, §2J1.4, but applied the higher guidelines of §2C1.1 pursuant to the cross-reference described in §2J1.4(c)(1).[1] After canvassing precedent on interpretation of the "under color of official right" doctrine, the court noted that in no other reported case was an impostor "successfully convicted or sentenced for extortion under color of official right." *Abbas*, 560 F.3d at 665. Accordingly, because the defendant had no official authority, he could not have misused the cloak of such official authority, and §2C1.1 could not be applied to him. *Id*. at 666.[2]

In light of the foregoing, the guideline section most appropriate to Mr Solorza's conduct would appear to be §2B3.3, which covers blackmail and extortion by persons other than public officials. Under that section, the base offense level is 9, and is increased by the levels specified in §2B1.1. Here, as the probation officer correctly notes, a 6-level increase is warranted, resulting in a total offense level of 15 if no other enhancements are permitted. The corresponding guideline range would be 18 to 24 months without a reduction for acceptance of responsibility, and 12 to 18 months with the reduction.

**4. Sentencing Argument**

*United States v. Booker*, 543 U.S. 220 (2005), directs the sentencing court to impose an appropriate sentence, unencumbered by offense levels, criminal history, or the availability of authorized downward departures. Under the post-*Booker* discretionary sentencing regime, there is

---

[1] That cross-reference directs the district court to apply the guidelines for the underlying substantive offense if the impersonation facilitated commission of that offense. The probation officer makes that same recommendation to this Court. PSR, ¶ 21.

[2] The court found the error harmless, however, as the district court stated that it would have applied the same sentence even if §2C1.1 was not applicable.

no longer any question that the advisory Guideline range is only one factor among several that this Court is required to consider in determining what constitutes a reasonable sentence. The Court is free to disagree with Guideline ranges and policy considerations. *See Kimbrough v. United States*, 128 S.Ct. 558, 57 (2007). Nor is it required to use a formulaic approach yielding a mathematical justification of non-Guidelines sentences. *Gall v. United States*, 128 S.Ct. 586, 596 (2007). Rather, it must exercise "reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors." *Rita*, 127 S.Ct. at 2469.

In *Gall*, the Supreme Court held that appellate courts cannot impose a requirement that "a sentence that constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances." *Gall*, 128 S.Ct. at 591. The Court likewise rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence," *id.* at 595, and held that it is within the district court's discretion to arrive at an appropriate sentence, "whether inside, just outside, or significantly outside the Guidelines range," *id.* at 591. The Court explained:

> [B]oth the exceptional circumstances requirement and the rigid mathematical formulation reflect a practice – common among courts that have adopted "proportional review" – of applying a heightened standard of review to sentences outside the Guidelines range. This is inconsistent with the rule that the abuse-of-discretion standard of review applies to appellate review of all sentencing decisions – whether inside or outside the Guidelines range.

*Id.* at 596.

The Court emphasized the importance of deferring to the judgment of the sentencing courts, explaining:

> The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and

> hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record. "The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court."

*Id.* at 597-98 (quoting *Rita*, 127 S.Ct. at 2469).

The foregoing makes clear that the district court has very broad sentencing discretion, limited only by reasonableness and the duty is to impose the least amount of time necessary to achieve section 3553(a)'s purposes. The Guidelines range is subordinate to that duty.

**A. The Record Does Not Support An Enhancement For Obstructing Justice**

The government has indicated that it will seek an adjustment for obstruction of justice on the grounds that Mr Solorza perjured himself. The record does not support this enhancement. To the contrary, Mr Solorza presented sufficient evidence of duress, including the testimony of other witnesses, to send the issue to the jury. The jury asked for clarification of the duress instructions: specifically, they requested a definition of "immediacy" as it related to threats against Mr Solorza and his family, and a definition of "no reasonable opportunity to escape." Matthews Decl., Exhibit A, 1342:13 - 1343:21. The Court provided definitions of these terms to the jury. It therefore is clear that the jury was weighing the evidence on this defense to determine whether Mr Solorza had met his burden.

Whether the government was able to use to its advantage the testimony of the defense gang expert, Detective Gabriel Huerta, is of no moment. The record demonstrated that the Nortenos claimed Red Morton Park. The Nortenos also are associated with a wide variety of violent crimes ranging from assault to murder. *See* Declaration of Madeline Larsen "Larsen Decl.," ¶ 5. And, as recent defense investigation reveals, between April 2009 and April 2011, there were 236 gang related

incidents in the beat the includes Red Morton Park. Larsen Decl., ¶ 3.

The jury in this case did nothing more than reject Mr Solorza's duress defense. The guilty verdicts carry no presumption or implicit findings of perjury. To the contrary, since Ninth Circuit precedent allocated to Mr Solorza the burden of proof on the justification defense, the jury's verdict stands for nothing more than a finding that he did not meet his burden

**B. A Sentence of Probation is Appropriate in This Case**

**(1) Compelling Family Circumstances Counsel Against a Prison Sentence**

Before and after *Booker*, whether characterized as a guidelines departure or section 3553(a) variance, courts have long recognized that a defendant's family pays a high price when the court imposes a prison sentence. Judge Sporkin observed that "Causing the needless suffering of young, innocent children does not promote the ends of justice." *United States v. Chambers*, 885 F.Supp. 12, 15 (D.D.C. 1995). This common-sense approach to sentencing affirms the public interest in holding a defendant accountable for his conduct while acknowledging the correlative public interest in minimizing harm to family members who will be affected by his incarceration. *See generally*, Hagan & Dinovitzer, *Collateral Consequences of Imprisonment for Children, Communities and Prisoners*, 26 Cirme & Justice 121 (1999). Mindful of the collateral consequences of separating a parent from his children, courts have not hesitated to impose non-guidelines sentences based on family circumstances. *E.g.*, *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (where guidelines range was 41 to 51 months, imposition of sentence of probation affirmed in part due to close relationship of father and child); *United States v. Husein*, 478 F.3d 318 (6th Cir. 2007) (where guidelines range was 37 to 46 months, imposition of 270 days home confinement affirmed based on family circumstances); *United States v. Galante*, 111 F.3d 1029 (2nd Cir. 1997) (affirming 13-level

departure in drug case from 46-57 months to 8 days where defendant showed he was a conscientious and caring father of two young sons who would have faced severe financial hardships).

### (2) A Sentence of Probation is Sufficient and Appropriate

In addition to section 3553(a)'s general directives, the Court has three additional sources from which it can draw in imposing a sentence of probation. The first is Congress. The pre-sentence report correctly notes that probation is authorized for all counts of conviction. 18 U.S.C. § 3561(c)(1).

The second and third sources are case law and the Department of Justice, respectively, and the Court need not probe very far to find in them support for a sentence of probation in light of compelling family circumstances. In *Gall*, the Supreme Court found that a sentence of probation was a reasonable and appropriate sentence for a young college student convicted of conspiracy to distribute Ecstasy, a crime which netted him $30,000. The government argued that probation was inappropriately lenient for such a serious offense and was inconsistent with the goal of promoting respect for the law. Mindful of this argument, the Court nonetheless observed that the government itself conceded probation was appropriate given compelling family circumstances:

> We also note that the Government did not argue below, and has not argued here, that a sentence of probation could never be imposed for a crime identical to Gall's. Indeed, it acknowledged that probation could be permissible if the record contained different – but in our view, no more compelling – mitigating evidence. Tr. of Oral Arg. 37-38 (stating that probation could be an appropriate sentence, given the exact same offense, if "there are compelling family circumstances where individuals will be very badly hurt in the defendant's family if no one is available to take care of them").

*Gall*, 128 S.Ct. at 602.

A recent study of the effects of parental imprisonment on children, funded by the Department

of Justice, similarly supports a sentence of probation. It concludes that "parental imprisonment predicts undesirable outcomes for children, and notes:

> An obvious option for preventing harmful effects of parental imprisonment on children is to imprison fewer parents. This could be achieved by increasing the use of alternative forms of criminal punishment, such as probation, intensive supervision, house arrest, electronic monitoring, community service, and day fines.

Murray, Farrington, Sekol and Olsen, *Effects of Parental Imprisonment on Child Antisocial Behavior and Mental Health: A Systematic Review*, § 5.2, p. 58 (September 23, 2009).

It bears mentioning that probation is not a free ride – it is punishment. *Korematsu v. United States*, 319 U.S. 432 (1942); *see generally United States v. Scott*, 424 F.3d 888, 897 (9th Cir. 2005) (probation is punishment and therefore justifies probationers' "sharply reduced liberty and privacy interests"). In addition, a sentence of five years probation would have the salutary effect of keeping this case under the Court's supervision two years longer than that permitted by the three-year statutory maximum of supervised release, *see* 18 U.S.C. § 3583(b)(2). The Court not only is free to impose a set of conditions appropriate to this case but also may impose these conditions over a greater period of time to accomplish and fully vindicate any societal interests it determines are served by those conditions.

**(3) A Sentence of Probation Will Sufficiently Protect the Public**

Mr Solorza has zero criminal history points. Statistically, he is the least likely of all to re-offend. According to a Sentencing Commission study, "Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points." *Recidivism and the "First Offender*," United States Sentencing Commission (May, 2004). In the same vein, government studies demonstrate that defendants "over the age of forty . . . exhibit markedly lower

rates of recidivism in comparison to younger defendants." *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, p. 12, 28 (2004).

These findings carry equal force even if the Court applies a departure analysis to this factor. In *United States v. Ward*, 814 F.Supp. 23 (E.D. Va. 1993), for example, the district court departed from a life sentence to 300 months for distribution of 27 kilograms of crack cocaine, 6.5 kilograms of powder cocaine, and possession of a firearm in connection with drug trafficking because the guidelines did not take into account "the length of time a person refrains from the commission of crimes." *Id.* at 24.

Here, with the exception of a petty theft conviction that occurred twenty-four years ago and for which he received probation (PSR, ¶ 42), Mr Solorza has remained free of criminal convictions. The length of time during which he has not engaged in criminal conduct therefore militates against a prison sentence.

**(4)  Mr Solorza Needs No Additional Deterrence**

Mr Solorza is a 46-year old father of four children, ranging in age from 6 to 15.  PSR, ¶ 50. He has been staggered by the prospect of being sent to prison, as well as the trauma of the trial itself. The numerous letters of support from persons who know Mr Solorza well[3] bear solemn testament that he will not re-offend, and he scarcely needs a period of incarceration to impress upon him the need to live within society's norms.

---

[3]     These letters are attached to this memorandum as Exhibit 1.

**5. Conclusion**

    For the reasons stated, defendant Frank Solorza respectfully requests that the Court impose a sentence of five years probation.

Dated: April 13, 2011

                                              Respectfully submitted,

                                              BARRY J. PORTMAN
                                              Federal Public Defender

                                                           /S/

                                              JEROME E. MATTHEWS
                                             Assistant Federal Public Defender