MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

KEVIN J. BARRY  (CABN 229748)
DENISE MARIE BARTON (MABN 634052)
Assistant United States Attorneys

   450 Golden Gate Ave., Box 36055
   San Francisco, California 94102
   Telephone:  (415) 436-7200
   Fax: (415) 436-7234
   E-Mail: kevin.barry@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br>    Plaintiff, ) <br> ) <br>    v. ) <br> ) <br> FRANK SALVADOR SOLORZA, ) <br> ) <br>    Defendant. ) <br> ) | No.  CR 09-0217 PJH <br><br> **UNITED STATES' SENTENCING MEMORANDUM** <br><br> Hearing:   April 20, 2011 <br> Time:      2:30 p.m. <br> Hon. Phyllis J. Hamilton |

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   **The Defendant's Offense Conduct** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  **Sentencing Guidelines: Offense Level Calculation and
     Criminal History Category** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.   The Offense Level Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.   Application of Enhancement for More than One Extortion . . . . . . . . . . . . . . . . . 4

     C.   Application of Enhancement for Vulnerable Victims . . . . . . . . . . . . . . . . . . . . 5

     D.   Application of Enhancement for Obstruction of Justice . . . . . . . . . . . . . . . . . . 7

          1.   *The Defendant's Own Gang Expert Contradicted the Defendant's
               Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          2.   *The Defendant's Testimony was Unbelievable and Untrue* . . . . . . . . . . . 9

     E.   There Can Be No Deduction For Acceptance of Responsibility . . . . . . . . . . . . . 10

III. **Section 3553(a) Factors Indicate a 51 Month Sentence is Appropriate** . . . . . . . . . . 12

IV.  **The Defendant Should Be Remanded to Custody at the Time of Sentencing** . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**INTRODUCTION**

The defendant Frank Solorza stands before the Court to be sentenced after being convicted of the following counts after a jury trial: conspiracy; impersonating a federal immigration officer, or aiding and abetting others to do so; demanding $50,000 in the false and pretended capacity of a federal immigration officer, or aiding and abetting others to do so; and four counts of attempted extortion by someone pretending to be a federal officer, or aiding and abetting others to do so.

As demonstrated below, the Guidelines provide for a sentence of imprisonment of between 51 and 63 months for the defendant's criminal conduct, and the government respectfully requests that the Court sentence the defendant to a term of 51 months – the low end of the Guidelines range – as well as to three years of supervised release and a $100 special assessment.

**DISCUSSION**

**I.      The Defendant's Offense Conduct**

In early 2009, the defendant, together with unknown co-conspirators, attempted to extort $50,000 from his first cousins, the Escatel family: Jesus Escatel; Ramon Escatel and his wife Veronica; Gabriel Escatel and his wife Irma; and Jose Rutilio Escatel.

Several years earlier, the Escatels had used Bertina Frost, a person they thought was an immigration lawyer, to help them convert their status from that of illegal immigrants to that of legal permanent residents by applying for work permits and green cards. Each member of the Escatel family paid Frost approximately $7,500 for her assistance. The Escatels later learned that Frost was not a lawyer and that she had submitted false statements on their behalf on their green card applications. As part of the application process, the Escatels went to an interview with immigration officials. As they admitted on the stand, the Escatels learned of the false statements in their applications before their interviews, but they did not correct these false statements and they received their green cards.

The defendant knew about the Escatels' involvement with Frost because his own brother and sister had also used Frost to assist with their paperwork, and in fact, the defendant's brother and sister were the ones who introduced the Escatels to Frost.

UNITED STATES' SENTENCING MEMORANDUM
CR 09-0217 PJH                                                          1

On February 2, 2009, one of the defendant's co-conspirators hand delivered a letter to each of the Escatels. The letter purported to be from an immigration official. The official told the Escatels that he knew they submitted false statements on their green card applications, and he offered to fix these problems in exchange for a substantial fee. The demand was as follows: $10,000 for Jesus Escatel; $15,000 for the couple of Ramon and Veronica; $15,000 for the couple of Gabriel and Irma; and $10,000 for Jose Rutilio, for a total of $50,000. If the payments were not made, the letter threatened prison and deportation.

After receiving the letter, the Escatels contacted ICE investigators, who set up a sting. The defendant was arrested when he arrived at the payoff to pick up what he thought was a bag filled with $50,000. He was dressed wearing a full clown suit, a clown glitter wig, a Pirates of the Carribean hat – complete with dreadlocks – and sunglasses, and he was riding a small child's bicycle.

When he was arrested, the defendant claimed that he was coerced into participation in the scheme by three purported Norteño gang members.

The grand jury returned an indictment on February 26, 2009, an indictment that was superseded on October 26, 2009. The superseding indictment alleged seven counts: conspiracy; two counts of impersonation of a federal official; and four counts of attempted extortion by a federal official. The trial was originally set for November 20, 2009, but the defendant changed counsel in the Fall of 2009, and trial was re-calendared for June 22, 2010. The case was tried to a jury, and the jury returned a verdict of guilty on all counts on June 30, 2010. Following his conviction, the defendant changed counsel once again, and sentencing was set for April 20, 2011.

///

UNITED STATES' SENTENCING MEMORANDUM
CR 09-0217 PJH                    2

**II.     Sentencing Guidelines: Offense Level Calculation and Criminal History Category**

     A.     <u>The Offense Level Calculation</u>

     In this case, the defendant was convicted of conspiracy and multiple counts of impersonating a federal officer, in violation of Title 18, United States Code, Section 912, and attempted extortion by someone pretending to be a federal officer, in violation of Title 18, United States Code, Section 872.  Each of these crimes has the same Guidelines calculation: the calculation for attempted extortion.  Under U.S.S.G. § 2X1.1(a), the offense level for conspiracy is calculated by determining the offense level for the substantive offense.  For the impersonation counts, where impersonation was to facilitate another offense, Section 2J1.4(c)(1) provides a cross reference to the Guidelines for attempt to commit that offense, if the offense level would be greater than through the operation of Section 2J1.4 alone.  In this case, the defendant and his co-conspirators impersonated a federal official for the purpose of extorting money, and, as seen below, the extortion Guideline provides a significantly higher offense level than the level six provided by Section 2J1.4.  Thus, the Guidelines sentences for conspiracy and impersonation of a federal officer each adopt the Guidelines calculation for extortion.

     The calculation for the attempted extortion by someone pretending to be a federal officer, in violation of Title 18, United States Code, Section 872, involves several specific offense characteristics and other enhancements:

<u>18 U.S.C. § 872 – Attempted Extortion by a Federal Official</u>
(and Conspiracy to do the same)

| | |
|---|---|
| <u>Base Offense Level</u>: <br>(U.S.S.G. §§ 2C1.1, 2X1.1(a), 2J1.4(c)(1)) | 12 |
| <u>Specific Offense Characteristics</u>: <br>(U.S.S.G. § 2C1.1(b)(1) <br>(More than one extortion)) | +2 |
| (U.S.S.G. § 2C1.1(b)(2),§ 2B1.1(b)(1)(D) <br>(Demand for more than $30,000)) | +6 |

UNITED STATES' SENTENCING MEMORANDUM
CR 09-0217 PJH                                    3

| | |
|---|---|
| Vulnerable Victims:<br>(U.S.S.G. § 3A1.1(b)(1)<br>(Victims were vulnerable illegal immigrants)) | +2 |
| Obstruction of Justice:<br>(U.S.S.G. § 3C1.1)<br>(Committing perjury) | +2 |
| Acceptance of Responsibility:<br>(U.S.S.G. § 3E1.1(a)) | -0 |
| TOTAL: | 24 |

United States Probation's Presentence Report (PSR) adopts each of these sentencing enhancements, with the exception of Obstruction of Justice. As the Court was present for the defendant's testimony, and the Probation Officer was not, the PSR defers application of this enhancement to the Court, as the Court was in a position to determine whether the defendant perjured himself on the stand. (PSR ¶¶ 15-17.) The bases for these enhancements are presented below.

The government agrees with the conclusion in the PSR that the defendant should be considered a Criminal History Category I.

  B.  Application of Enhancement for More than One Extortion

The enhancement for multiple acts of extortion is appropriate here because there were at least four sets of victims: (1) Jesus Escatel; (2) Ramon Escatel and Veronica Sanchez; (3) Gabriel and Irma Escatel; and (4) Jose Rutilio Escatel. The existence of multiple acts of extortion is confirmed by the jury's verdict, as they returned convictions for four separate counts of extortion. The "immigration official" the defendant and his co-conspirators pretended to be promised to fix at least four sets of immigration paperwork, and he delineated separate payment for each set. Thus, there were multiple acts of extortion.

In *United States v. Kahlon*, 38 F.3d 467, 470 (9th Cir. 1994), the Ninth Circuit affirmed the district court's conclusion that the defendant's multiple payments to advance separate applications for work papers constituted more than one bribe or extortion under U.S.S.G. §

2C1.1(b)(1), rather than a single action. The court held that even if multiple payments are part of a larger conspiracy, they are not necessary installment payments for a single action. *Id.*

Similarly, when official services rendered are of the same nature, yet are ongoing rather than a single task, they do not constitute a single action. *See United States v. Morales*, 11 F.3d 915, 916-17 (9th Cir. 1993). In *Morales*, the Ninth Circuit affirmed the district court's determination that periodic payments were different bribes where payments were at varying intervals, of varying amounts, and from different sources. *Id.* at 917

In this case, while the victims of the extortion were all targets of the same scheme, the proposed payments were supposed to influence multiple official actions. If the payments had occurred, the defendant and his cohorts claimed they would alter immigration papers for six individuals: Jesus Escatel, Ramon Escatel, Veronica Sanchez, Gabriel Escatel, Irma Escatel, and Jose Rutilio Escatel. Therefore, as in *Kahlon*, this case involves multiple acts, and the enhancement of § 2C1.1(b)(1) applies. Additionally, as in *Morales*, the extortion payments were to be of varying amounts and from multiple sources. Jesus Escatel and Jose Rutilio Escatel were each instructed to pay $10,000, while the two couples were instructed to pay $15,000 each. While the defendant and his co-conspirators eventually required payment of all $50,000 at once, it is plain that the initial demand constituted multiple acts of extortion, and the subsequent demand for simultaneous collection of all four payments does not change that fact.

C.   Application of Enhancement for Vulnerable Victims

The enhancement for vulnerable victims is applicable in this case for two independent reasons: (1) the victims were illegal immigrants threatened by the defendant with prison and deportation; and (2) the defendant knew that the victims had been the subject of a separate, earlier fraud.

The § 3A1.1 adjustment was designed to protect vulnerable victims and to reflect the increased depravity of crimes specifically targeting vulnerable individuals. "The enhancement is appropriate when a defendant's activities are directed towards those in need of greater societal protection, thus rendering the defendant's conduct more criminally depraved." *United States v. Randall*, 162 F.3d 557, 560 (9th Cir. 1998); *see also United States v. Castellanos*, 81 F.3d 108,

110-11 (9th Cir. 1996). The goal of the vulnerable victim provision is "to deter such a crime, to protect the public from additional crimes of such a defendant, and to adequately reflect the heinous nature of such an offense." H.R. Rep. 104-548 (quoting Pub. L. 103-322, 108 Stat. 1796). Thus, the policy considerations motivating § 3A1.1 strongly favor application of the adjustment to illegal aliens who are particularly vulnerable to abuse. As the Supreme Court has noted, undocumented aliens are a "vulnerable population" who can be subject to exploitation. *McNary v. Haitian Refugee Center*, 498 U.S. 479, 482 n.4 (1991) (quoting H.R. Rep. 99-682); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 879 (1975). Ninth Circuit decisions have echoed this finding, noting that aliens are especially vulnerable to exploitation, including "acts of illegal and reprehensible conduct." *See, e.g.*, *Rivera v. NIBCO*, 364 F.3d 1057, 1065 (9th Cir. 2004) (citation omitted).

The Ninth Circuit has consistently found that illegal aliens with linguistic and cultural barriers are vulnerable victims, requiring upward adjustments to defendants' offense levels. *See, e.g.*, *United States v. Sierra-Velasquez*, 310 F.3d 1217, 1220 (9th Cir. 2002) (upholding the adjustment because the victims were illegal aliens at the mercy of their smugglers); *United States v. Veerapol*, 312 F.3d 1128, 1134 (9th Cir. 2002) (finding the adjustment appropriate due to the victim's immigration status, as well as her linguistic, educational, and cultural barriers); *United States v. Mendoza*, 262 F.3d 957, 960-62 (9th Cir. 2001).

Further, under the Commentary to this Guideline and Ninth Circuit case law, individuals who have been previously victimized are vulnerable victims on that basis alone. According to the Commentary, "'vulnerable victim' means a person . . . who is unusually vulnerable due to age, physical or mental condition, or *who is otherwise particularly susceptible to the criminal conduct*." U.S.S.G. § 3A1.1 cmt. n.2 (emphasis added). The Ninth Circuit has interpreted this to mean that individuals who have been victimized by similar criminal conduct before are particularly susceptible. *See, e.g.*, *Randall*, 162 F.3d at 560 (9th Cir. 1998) (finding that the victims were vulnerable victims under the Guidelines because they "have a track record of falling for fraudulent schemes"); *Castellanos*, 81 F.3d at 111 (9th Cir. 1996) (noting that numerous "Ninth Circuit cases uphold[] a 3A1.1 increase for particular susceptibility").

UNITED STATES' SENTENCING MEMORANDUM
CR 09-0217 PJH                                                  6

Here, the defendants testified that they were illegal immigrants and had been involved in an ICE investigation related to Bertina Frost a few years prior to the events of this case. Thus, they were in a precarious position with regard to their status in this country, and the defendant specifically attempted to exploit that vulnerability. Although some of them had slight familiarity with English, each of the victim witnesses spoke at trial with the aid of a Spanish interpreter. Finally, the defendant knew that the Escatels – his first cousins – had fallen victim to Bertina Frost's fraud, as had the defendant's own brother and sister. Thus, under their status as illegal immigrants and as prior fraud victims, the Escatels qualify as vulnerable victims in this case, and the enhancement under Section 3A1.1 is appropriate.

D. Application of Enhancement for Obstruction of Justice

Section 3C1.1 provides a two level enhancement to a defendant's offense level when the defendant willfully obstructs or impedes justice, which includes the commission of perjury during a court proceeding. U.S.S.G. § 3C1.1, cmt 4(b). In broad strokes, the enhancement is warranted here because the defendant offered a duress defense that was predicated entirely on his false testimony. After he was caught completely red-handed, the defendant concocted a fantastic and ridiculous story that he was put up to the crime by three Norteño gang members. The defendant spent considerable time spinning the tale of the Norteños, both on direct and under cross examination. However, critical aspects of the defendant's story were directly contradicted by the defendant's prior statements – in the form of his confession immediately after his arrest – by the testimony of the defendant's own witnesses, and by the testimony of witnesses called by the government.

*1.  The Defendant's Own Gang Expert Contradicted the Defendant's Testimony*

The defendant called Detective Gabriel Huerta of the San Mateo County Sheriff's Department Gang Intelligence Unit to establish that the park where he claims the Norteños first approached him is Norteño territory. Detective Huerta supported this contention, but on cross

UNITED STATES' SENTENCING MEMORANDUM
CR 09-0217 PJH                               7

examination, he demonstrated that significant aspects of the defendant's story are completely without basis.

First, he testified that there were no Norteños in the database of gang members his office maintains with the names and physical descriptions provided by the defendant upon his arrest. (Declaration of Kevin J. Barry ("Barry Decl."), Ex. A at 957:8 - 959:20 (transcript of Huerta cross-examination).)

Second, Detective Huerta testified that Norteños do not behave in a manner consistent with the defendant's story. Detective Huerta has considerable experience with gang members in San Mateo County, having personally interviewed over 4,000 of them during the course of his 15 year career. (*Id.* at 957:3-7.) The defendant claimed that he was coerced into assisting three Norteños into "taking care of some business" for them, with the particular nature of the "business" unspecified (Barry Decl., Ex. B at 1001:10-20; 1002:10-16; 1005:17-18; 1047:20 - 1048:1 (transcript of defendant's testimony); that they needed his phone to call the victims in this case; (*id.* at 1002:16; 1008:9-11; 1015:6-7; 1019:17-19; 1047:20 - 1048:1); and that he was forced to go to his cousin Jesus' house to pick up a bag filled with papers (*id.* at 834:15-17; 993:23 - 995:14).

As Detective Huerta testified, however, Norteños simply do not operate this way. Norteños don't get involved in extortion or immigration crimes. (Barry Decl., Ex. A at 961:7-12 and 17-22.) Norteños don't coerce innocent third parties to become involved in criminal activity. (*Id.* at 961:23 - 963:1) Norteños don't force others to surrender their phones and then return them in a repeated pattern over the course of days or weeks. (*Id.* at 963:6-10.) When they need to use a phone than cannot be traced back to them, Norteños use a "burner phone." (*Id.* at 963:16 - 964:14.) Norteños always dress in their colors; they don't use disguises, let alone engage in crimes wearing clown suits. (*Id.* at 961:13-16; 964:15 - 965:6.)

///

UNITED STATES' SENTENCING MEMORANDUM
CR 09-0217 PJH                               8

2.  *The Defendant's Testimony was Unbelievable and Untrue*

The defendant's casual relationship with veracity on the stand was perhaps best demonstrated in response to his testimony about whether he was Mirandized following his arrest. On cross examination, he initially claimed that he was never read his rights. (Barry Decl., Ex. B at 1105:18-21.) When challenged regarding this testimony, the defendant considered the truth as being only one of a variety of possible alternatives:

> Q: Let's talk about the moment you were arrested. Right after you were arrested, Agent Scheffel read you your rights, didn't he?
>
> A: He never did, but –
>
> Q: I am sorry. He never read you your rights?
>
> A: I don't remember he said that.
>
> \* \* \* \*
>
> Q: Is it your testimony that Agent Scheffel never read you your rights?
>
> A: I am going to say [. . .] I would rather go with [. . .] He did read me my rights. I will go with that.

(*Id.* at 1105:18 - 1106:15 (ellipses added).)

In addition to the defendant's general approach with respect to truthfulness, the specifics with respect to the defendant's story are completely implausible and untrue. The key to the defendant's duress claim was his assertion that he believed that the purported Norteños would kill his children if he refused their commands. (*Id.* at 1043:17 - 1044:11; 1045:23 - 1043:3; 1047:12-19.) At the same time, however, the defendant testified that he repeatedly defied them. He defied their direction to leave a red bandanna in his truck. (*Id.* at 1047:12-19.) He defied their mandate that he provide them with his phone on demand by hiding his phone. (*Id.* at 1048:5 - 1049:13.) He defied their command immediately to "block" his phone so its number would not display when making calls. (*Id.* at 1069:4 - 1070:13.) Finally – and this best highlights the absurdity of the defendant's story – he defied the Norteños by wearing a clown suit to pick up the money from Jesus Escatel. (*Id.* at 1070:19 - 1072:25.) This represented

UNITED STATES' SENTENCING MEMORANDUM
CR 09-0217 PJH                     9

defiance because the Norteños planned on him wearing something "professional" to pick up the money. (*Id.*) Despite this plan, and for reasons he could not articulate, the defendant decided instead to purchase and wear a clown suit, provoking the wrath of the Norteños. (*Id.* at 1021:17 - 1023:3; 1025:4 - 1026:4; 1070:19 - 1072:25.)

Further, the defendant's claimed reaction to his realization that Jesus Escatel was the object of the Norteños' "business" is preposterous. The defendant testified that he only learned that he was picking up the "papers" from Jesus when he looked through his disguise as he was reaching for the briefcase, and that this caused him to "black out." (*Id.* at 1033:17 - 1034:15.) At the same time, however, this information was so shocking to him that he signaled to the Norteños that he was not going to go through with whatever they wanted him to do. (*Id.* at 1034:16 - 1035:5; 1104:3-20.) Again, these are the same Norteños who threatened to kill his children if he did not comply with their commands. (*Id.* at 1043:17 - 1044:11; 1045:23 - 1043:3; 1047:12-19.) In essence, the defendant's story is that he was willing put the lives of his children in jeopardy simply because (1) he decided to wear a clown suit instead of the "professional" attire the Norteños had planned for the pickup and (2) because it was his cousin – whom he had not seen in years – from whom the Norteños wanted some papers. (*See id.* at (1033:7-15 (defendant had not seen Jesus Escatel in seven or eight years); 1074:7-14 (defendant only knew he was to pick up a package with papers in it).)

The obstruction of justice enhancement is appropriate in this case because the defendant's testimony was patently fabricated, absurd, and untrue.

### E.  There Can Be No Deduction For Acceptance of Responsibility

Section 3E1.1.(a) of the Guidelines provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." The Commentary on this provision states:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. . . .  In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.

> This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

U.S.S.G. § 3E1.1 cmt. n.2. Thus, to be eligible for the reduction a defendant must clearly accept responsibility for his offense, and he must almost always do so pre-trial. Indeed, in 1992, the Guidelines and Commentary were explicitly revised to emphasize this fact through the introduction of the "[i]n rare situations" language.

Based on the plain language of the Commentary, the defendant is ineligible for a reduction for acceptance of responsibility. Far from accepting responsibility, throughout the case the defendant has denied knowledge of, and involvement in, any sort of scheme to extort the Escatels.

In the Ninth Circuit, defendants who put on a duress defense cannot accept responsibility at trial, or post-trial, but only pre-trial based on "extensive statements *before* trial in which [they] accept [] responsibility for their criminal activity." *United States v. Gamboa-Cardenas*, 508 F.3d 491, 506 (9th Cir. 2007). A defendant cannot accept responsibility *at trial*, because presentation of a duress defense is incompatible with acceptance of responsibility at trial. *United States v. Johnson*, 956 F.2d 894, 904 (9th Cir. 1992) (superceded on other grounds). In *Johnson*, the court noted that if the defendants' duress defense was accepted, "they would have proved a complete defense–a defense that, although their actions were voluntary, they were not responsible for what they did. Consequently, these defendants are not entitled to a reduction for acceptance of responsibility during the trial." *Johnson*, 956 F.2d at 904. Since duress is a denial of responsibility for one's actions, it is incompatible with acceptance of responsibility under § 3E1.1. *Id.*

Moreover, a defendant cannot obtain a § 3E1.1 reduction by accepting responsibility for his offense *after trial*. *United States v. Martinez-Martinez*, 369 F.3d 1076, 1090 (9th Cir. 2004). Under the Guidelines, a defendant's "purported acceptance of responsibility for his crimes, which occurred during the sentencing phase of trial following his conviction, may not properly

UNITED STATES' SENTENCING MEMORANDUM
CR 09-0217 PJH                              11

form the basis for a downward adjustment under 3E1.1." *Id.*; *see also United States v. Hall*, 952 F.2d 1170, 1171-72 (9th Cir. 1991) (holding that a defendant cannot accept responsibility under the Guidelines at sentencing to receive a lighter sentence).

Instead, only in very limited, fact specific circumstances may a defendant who puts on a duress defense obtain a reduction under § 3E1.1, and this is only by accepting responsibility *pre-trial* – for example in "debriefings" and "in post-arrest statements." *Gamboa-Cardenas*, 508 F.3d at 504-06. As the court notes in *Gamboa-Cardenas*, defendants are eligible for the reduction solely based on their pre-trial conduct because "our previous decisions [] limit as a matter of law the availability of a sentencing reduction for acceptance for responsibility when a defendant unsuccessfully presents a defense of duress at trial." *Id.* at 505. Moreover, as recognized in *Martinez-Martinez*, these limits on when and how a defendant can accept responsibility are firmly rooted in the Guidelines and Commentary, which provide that "'a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.'" 369 F.3d at 1090 (quoting U.S.S.G. § 3E1.1 cmt. n.2).

Given this standard, the defendant is not entitled to a reduction for acceptance of responsibility. He put on an affirmative defense of duress and therefore did not accept responsibility during trial. Under *Martinez*, any statements that he made during sentencing would be insufficient to entitle him to the reduction. Moreover, nothing that he said or did indicated his acceptance of responsibility prior to trial. *Cf. Gamboa-Cardenas*, 508 F.3d at 505. At no point has the defendant clearly demonstrated recognition and affirmative acceptance of personal responsibility, and therefore, he cannot receive the benefit of § 3E1.1.

**III.     Section 3553(a) Factors Indicate a 51 Month Sentence is Appropriate**

Section 3553(a) directs courts to consider a number of factors in determining an appropriate sentence, but the critical ones for this case are: the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense § 3553(a)(2)(A); and the sentencing range provided by the Guidelines, § 3553(a)(4).

As described above, the defendant participated in a scheme to extort a substantial amount of money from members of his very own family, people he believed were vulnerable because of their tenuous status in the United States. He and his cohorts threatened his cousins and their families with deportation and imprisonment unless they came up with $50,000. As the trial testimony indicated, a co-conspirator went to the Escatels' homes – the place where we most need to feel safe – to deliver an extortion demand, and they repeatedly made threatening phone calls, causing considerable stress and fear in the victims. (*See* PSR ¶ 14 and Victim Impact Statements.) The defendant's actions have not only irrevocably ruptured familial relationships; he has made the Escatels less secure, more anxious, and less trusting of others. (*Id.*)

The defendant has completely abdicated any responsibility for his conduct. Not only did he force his victims to relive their experiences on the stand, which is his constitutional right; he concocted a ridiculous story about his involvement and offered completely implausible testimony, basically making things up as he went along. (*See, e.g.*, Barry Decl., Ex. B at 1075:16 - 1090:25 (cross examination regarding when defendant told the Norteños he was going to wear the clown suit instead of the professional attire they had for him).) Although the defendant was aware of the presence of Norteños in his area, his reliance on phantom gang members as his defense was ill-advised, because, unlike Detective Huerta, the defendant did not know enough about how the Norteños actually operate.

Thus, the serious nature of the crime and the defendant's refusal to accept responsibility warrant a substantial sentence in this case, and the Guidelines provide for such a term: 51-63 months for a Criminal History Category I. With respect to a sentence within this range, there is nothing here to indicate that this case is outside of the "heartland" of cases encompassed by the Guidelines, such that a below-Guidelines sentence would be appropriate. If anything, the nature of the victims in this case and the defendant's conduct at trial could support an argument for a more severe sentence. However, given the fact that the defendant has little criminal history,

UNITED STATES' SENTENCING MEMORANDUM
CR 09-0217 PJH                                              13

(PSR ¶¶ 41-46), and that the defendant has several minor children, one of whom testified at the trial, a sentence at the low end of the Guidelines range will provide sufficient punishment and will allow him to resume a role in his children's lives once he is released.

While it is true that a 51 month sentence is a considerable term for a first offense, the same could be said for many individuals who are involved in bribery, extortion under color of official right, and generic fraud offenses. *See* 18 U.S.C. § 3553(a)(6) (courts should consider the need to avoid sentencing disparities among defendants with similar records who have been found guilty of similar conduct). In fact, unlike the situation where an official solicits a bribe from a business person, or where a defendant defrauds a faceless corporation, the defendant here victimized real people whom he knew were vulnerable, and he knew of their vulnerability because they are members of his own family.

Based on the nature of the crime, the defendant's conduct, and the provisions of the Guidelines, a 51 month sentence, followed by three years of supervised release, will be sufficient, but not greater than necessary, to achieve the goals of sentencing as expressed in Title 18, United States Code, Section 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).

**IV.     The Defendant Should Be Remanded to Custody at the Time of Sentencing**

The jury convicted the defendant on June 30, 2011, and the time has come for him to begin serving his sentence. Upon his conviction, the United States moved for remand under Title 18, United States Code, section 3143(a), but the Court permitted the defendant to remain on bail. Afterwards, the defendant changed counsel for the second time and obtained several continuances to permit new counsel to represent him adequately at sentencing. (Dkt Nos. 123, 126, 127, 128, 130.) Nearly 10 months have passed since the jury returned its verdict. The defendant is not entitled to remain on release until he has exhausted his appellate rights or until he finally accepts the reality and the consequences of his conviction. The defendant has had ample time to arrange his affairs and to prepare for imprisonment, and the Court should, as the law directs, remand the defendant following sentencing.

UNITED STATES' SENTENCING MEMORANDUM
CR 09-0217 PJH                                              14

Title 3143(b)(1) provides that the Court shall remand a person found guilty of an offense, even if that person has filed an appeal, unless the person demonstrates (1) that he is not a risk of flight or danger to the community and (2) that the appeal raises a substantial question that is likely to result in reversal of the conviction or an order for a new trial. In the event the defendant files an appeal, he should be remanded to custody because he cannot meet the requirements of Section 3143(b)(1).

As to the first prong, the United States recognizes that the defendant has performed well thus far under the conditions of his release. However, upon pronouncement of sentence, the stakes change, and the defendant will be facing a definite term of imprisonment, thereby providing a great incentive to flee. Further, since his conviction, the defendant no longer has primary physical custody of his children and is in the process of divorcing his wife, so the defendant's family status, which was a reason that previously supported his release, has changed considerably. These factors also increase the possibility of flight.

However, the deciding factor should the defendant appeal is the second prong of Section 3143(b)(1). For the Court to permit the defendant to remain on release, current counsel must identify the issues to be raised on appeal and identify what "substantial question" the appeal raises. The Court must then make a finding that the defendant's appeal "is not for the purpose of delay **and** raises a substantial question of law or fact likely to result in reversal [or] an order for a new trial." 18 U.S.C. § 3143(b)(1) (emphasis added). The Ninth Circuit has found that a "substantial question" is one that is "fairly debatable." *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985).

As the Court observed, the defendant's prior counsel capably litigated this case in pre-trial motions and during trial. As a result of prior counsel's efforts, the defendant was able to present a duress defense over the objection of the United States. Although the defendant has not yet identified what issues he may raise on appeal, no such issues would raise a substantial question that would result in a reversal or new trial. Thus, the defendant should be remanded at the time of sentencing.

UNITED STATES' SENTENCING MEMORANDUM
CR 09-0217 PJH                                         15

**CONCLUSION**

In full consideration of the nature of the crime, the defendant's history and characteristics, as well as the other goals of sentencing, the United States respectfully requests that the Court sentence the defendant Frank Solorza to 51 months in custody, followed by three years of supervised release, and a $100 special assessment.

Dated: April 13, 2011                          Respectfully submitted,

                                                  MELINDA HAAG
                                                  United States Attorney

                                                  /s/
                                                KEVIN J. BARRY
                                                DENISE MARIE BARTON
                                                Assistant United States Attorneys