1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  KEVIN J. BARRY  (CABN 229748)
   DENISE MARIE BARTON (MABN 634052)
5  Assistant United States Attorneys

6     450 Golden Gate Ave., Box 36055
      San Francisco, California 94102
7     Telephone:  (415) 436-7200
      Fax: (415) 436-7234
8     E-Mail: kevin.barry@usdoj.gov

9  Attorneys for the United States of America

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,          )    No.  CR 09-0217 PJH
                                       )
14          Plaintiff,                 )
                                       )
15             v.                      )    UNITED STATES' SENTENCING
                                       )    REPLY
16  FRANK SALVADOR SOLORZA,            )
                                       )    Hearing:      April 20, 2011
17          Defendant.                 )    Time:         2:30 p.m.
                                       )    Hon. Phyllis J. Hamilton
18  _____)

19

20                         INTRODUCTION

21        In its sentencing memorandum, the government presented the correct Sentencing

22  Guidelines calculation for the defendant's convictions and explained why a 51 month sentence is

23  appropriate.  In the defendant's sentencing memorandum, he challenges the application of

24  several of the Guidelines, including the calculation of the base offense level.  None of the

25  defendant's arguments has merit, and the government respectfully requests that the Court

26  sentence the defendant to a 51 month term of imprisonment, followed by three years of

27  supervised release and a $100 special assessment.

28

UNITED STATES' SENTENCING REPLY
CR 09-0217 PJH

1

2

**DISCUSSION**

**I.   U.S.S.G. § 2C1.1 Is The Correct Guideline To Apply At Sentencing**

3

The defendant provides absolutely no support for his assertion that Section 2C1.1 of the

4

Guidelines should not apply to his convictions under 18 U.S.C. § 872, extortion while pretending

5

to be a federal official.  Instead, he cites to a single case from the Seventh Circuit, *United States*

6

*v. Abbas*, 560 F.3d 660 (7th Cir. 2009), for the proposition that persons impersonating federal

7

officials cannot be acting "under color of official right," and therefore, that Section 2C1.1 should

8

not apply when sentencing such pretenders.  There are a number of problems with the

9

defendant's reliance on this case.

10

First and foremost, the defense fails to mention that the defendant in *Abbas* was not

11

charged with or convicted of a violation of 18 U.S.C. § 872.  Rather, the defendant in that case

12

was acquitted of a Hobbs Act charge and convicted of impersonating an FBI Special Agent, 18

13

U.S.C. § 912.  *Abbas*, 560 F.3d at 661.  There were no Section 872 charges.  The Guideline for

14

offenses under 18 U.S.C. § 912 is Section 2J1.4.  That Guideline contains a cross reference – if

15

the impersonation was to facilitate another offense, apply the Guideline for that other offense if

16

the resulting offense level is higher.  U.S.S.G. § 2J1.4(c).  In *Abbas*, the trial court determined

17

that the FBI impersonation was for the purpose of Hobbs Act extortion, specifically, "color of

18

official right extortion," despite the defendant's acquittal on that charge.  *Abbas*, 560 F.3d at 661.

19

The Court then applied the Guideline for 18 U.S.C. § 1951, which is § 2C1.1.  *Id.* at 662;

20

U.S.S.G. Appendix A – Statutory Index at 553.

21

On appeal, the Seventh Circuit determined that the application of this Guideline was

22

improper for "color of official right" extortion by an impersonator.  The court equated the

23

definition of "color of official right" in § 2C1.1 to the definition found in the Hobbs Act and

24

analyzed the use of this term in cases interpreting that Act.  *Id.* at 663 n.4; 663-65.  The court

25

held that for criminal liability to attach for extortion under color of official right, the person

26

carrying out the extortion must actually be "entrusted with authority by the public."  *Id.* at 665.

27

Therefore, impersonators cannot be liable for this conduct under the Hobbs Act, and Section

28

2C1.1 cannot be applied to them at sentencing.  *Id.* at 666.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

     *Abbas* is inapplicable to this case for the simple reason that the defendant here – unlike the defendant in *Abbas* – was convicted of 18 U.S.C. § 872.  The Hobbs Act criminalizes extortion involving the "wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2) (defining "extortion").  There is nothing in the statute that addresses those pretending to exercise official authority.  By contrast, Section 872 explicitly addresses such impersonators.  It not only prohibits any officer or employee of the United States from committing extortion or attempting to commit extortion; the statute specifically forbids people like the defendant – an imposter "representing himself to be or assuming to act as such, under color or pretense of office or employment" – from such acts.  18 U.S.C. § 872.  The generic definition of extortion is "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats."  *Scheidler v. N.O.W., Inc.*, 537 U.S. 393, 410 (2003).  There is no question that the defendant's conduct in this case involved the use of fear and threats – the letters and the phone calls promised deportation and imprisonment if the $50,000 were not paid, and there is no question he and his co-conspirators pretended to be an immigration official.  Thus, the discussion in *Abbas* of the "under color of official right" language from the Hobbs Act has no bearing on the defendant's conviction under Section 872.

18
19
20
21
22
23

     Further, not a single case has adopted the holding of *Abbas* with respect to the inapplicability of 2C1.1 to impersonators.  The cases that cite *Abbas*, almost entirely within the Seventh Circuit, generally apply the holding that the "error" in the Guidelines calculation was harmless because of the trial court's detailed assessment of why it would have given the same sentence under§ 3553(a).  *See Abbas*, 560 F.3d at 667-68.  No case following *Abbas* cites its holding that § 2C1.1 should not be applied to impersonators.

24
25
26
27

     The language of Section 872 is explicit that those pretending to be federal employees or officials and who commit extortion under such pretended capacity are criminally liable.  The Guidelines clearly indicate that the Guideline to apply in sentencing such individuals is 2C1.1.  *See* U.S.S.G. Appendix A – Statutory Index at 549.

28

UNITED STATES' SENTENCING REPLY
CR 09-0217 PJH                                        3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The defendant's claim that Section 2C1.1 is reserved solely for actual public officials is further weakened by considering the Guideline itself. Subsection 2C1.1(a) delineates between public officials and others, indicating that the Guideline can apply to non-public officials. The only place in the Guideline where "under color of official right" appears, besides the title, is in the Commentary, in which the term "public official – as opposed to others, such as impersonators – is defined to include those who act "under color of law or official right." U.S.S.G. § 2C1.1, Application Note 1(E)(ii).

The fact that non-public officials can be sentenced under this Guideline is also supported by considering the amendments to the Guidelines. In November 2004, the Sentencing Commission amended Section 2C1.1 to distinguish between public officials and others; prior to that time, public officials and others were treated equally. *See* U.S.S.C. Guidelines Manual / Supplement to Appendix C, Amendment 666, at 66-76. The reason for the amendment was to ensure greater punishment for public officials who abuse their trust. *Id.* at 82; *see also* U.S.S.G. § 2C1.1(1) (base offense level for public officials is 14; 12 for others).

Thus, the defendant's claim that only actual public officials, as opposed to impersonators and others, are subject to sentencing under U.S.S.G. § 2C1.1 is completely without merit

## II.  The Escatels Qualify As "Vulnerable Victims" Under U.S.S.G. § 3A1.1(b)(1)

As discussed in the government's sentencing memorandum, the Escatels qualify as "vulnerable victims" for the purposes of U.S.S.G. § 3A1.1(b)(1) on two independent bases: they are illegal immigrants; and they had previously been victimized by Bertina Frost.

The defendant challenges this sentencing enhancement by arguing that the Escatels reported the extortion to ICE and that some of them suspected that the defendant may be involved in the crime. Apparently, in the defendant's view, the only "vulnerable" victims are those who do not report criminal conduct to law enforcement and allow themselves to be victimized or those who do not suspect the identity of the perpetrators. This completely misses the point of the enhancement.

The Guidelines provide for increased punishment for those criminals who target individuals whom they know are "particularly susceptible to criminal conduct." U.S.S.G. § 3A1.1, Application Note 2. In this case, the evidence established that the defendant knew that the Escatels had submitted false statements on their immigration paperwork. He knew this because they were members of his extended family and because his brother and sister introduced the Escatels to the person who engineered these false statements. The defendant knew that the Escatels had no legal status, and the extortion in which he participated was specifically designed to exploit that fact, as the letter hand-delivered to the Escatels' homes makes plain: "Upon reviewing your papers, I noticed you gave false information on your green card and papers." (Reply Declaration of Kevin J. Barry, Ex. A (Exhibit 1).) Thus, the defendant's criminal conduct was targeted directly at individuals whom he believed were specifically vulnerable to extortion – illegal immigrants who lied on their green card applications.

The defendant's own authorities support the application of this enhancement. In *United States v. Peters*, 962 F.2d 1410 (9th Cir. 1992), the Ninth Circuit approved the application of this enhancement to a class of victims as broad as "individuals having poor credit histories." *Id.* at 1412. The court determined that the positive response of the victims to the defendants' fraudulent solicitation "could reasonably be anticipated to result from this criminal conduct." *Id.* at 1418.

> The Peters knew or should have known that individuals with poor credit backgrounds were more likely than others to succumb to the solicitation and were particularly susceptible to the scam. That, in fact, is precisely why the Peters targeted the solicitation at these individuals.

*Id.* Here, the characteristic of the victims that made them especially vulnerable was considerably more specific than the simple fact of having poor credit histories.

In *United States v. Castellanos*, 81 F.3d 108, 111 (9th Cir. 1996), the only other case cited by the defendant, the court explained its decision in *Peters*: "Since the defendants knew the victims shared a common characteristic, a need for credit, the targeting of them by promising easy access to credit was more criminally depraved." In *Castellanos*, the Ninth Circuit rejected the application of 3A1.1(b) because the common characteristic of the victims in that case was

only the fact that they were Spanish speakers in Southern California. *Id.* at 112. The court noted, however, that such a broad class could still merit the Guideline enhancement, depending on the facts of the case. *Id.* As explained above, the characteristic of the Escatels that made them particularly susceptible to the defendant's crime is exponentially more specific than merely a shared non-dominant language in a broad geographic area.

## III.   The Defendant Cannot Receive A Reduction For Acceptance Of Responsibility

As discussed in the government's sentencing memorandum, a defendant who takes a case to trial and is convicted is ineligible for an offense level deduction for acceptance of responsibility. U.S.S.G. § 3E1.1, Application Note 2. This is particularly so when the defendant advances a defense of duress, as this defense is predicated on the notion that the defendant is not responsible for his actions. *United States v. Johnson*, 956 F.2d 894, 904 (9th Cir. 1992) (superceded on other grounds). Faced with this reality, the defendant's argument is that he accepted responsibility by speaking with agents upon his arrest and: (1) admitted that he had knowledge of the immigration letters; (2) admitted he rode to Jesus Escatel's house on the small bicycle while wearing a clown suit; and (3) admitted that the purpose of going to the house was to pick up money to fix immigration papers. (Def. Sentencing Memo at 6:1-6.)

What this argument completely ignores, however, is the fact that when he testified, the defendant repeatedly retreated from the statements he made during that post-arrest interview. In contrast to a defendant who accepts responsibility at the time of arrest through pretrial statements and debriefing, the defendant repeatedly claimed that he did not tell agents everything at the time of his arrest. (Declaration of Kevin J. Barry In Support of U.S. Sentencing Memo ("Barry Decl.") (Dkt #136), Ex. B at 1044:2-24; 1108-:10-22 (transcript of defendant's testimony).) Further, he testified that the report, which memorialized his statements is not accurate: "But they twisted my words, they got their story. My story was like the opposite. Their story was the opposite of what I say." (*Id.* at 1045:6-8.)

> I did tell them these people was threatening me, me and my kids and family, I told
> him that. If he didn't put on the report, just like a lot of things were not put on the

report, the whole thing, writing the report, I was honest.  I was honest about a lot of things, just like my wife was, and they twisted everything around, not the same way we said it.

(*Id.* at 1049:20 - 1050:1.)

I was crying, talking to him [Agent Scheffel] then that I was forced, that I was brought to the house, that I was – telling him that if he wrote something different on the paper, which I signed the paper that everything I said was like the opposite of what I said.  It was not what I said on the paper.  Total different.

(*Id.* at 1109:10-14.)

The defendant's claim that he accepted responsibility by admitting that he knew about the immigration letters when he was arrested, point (1) above, also fails.  On the stand, the defendant claimed that his statement to Agent Scheffel that he knew the letters threatened the Escatels may not have be true.  (*Id.* at 1115:10 - 1116:7 ("Like I said, I was worried about my kid and I just wanted them to – I might have said something that wasn't truth because I was worried about my kids.").)

With respect to the defendant's post-arrest admission that the purpose of going to his cousin's house was to pick up money to fix immigration papers, point (3) above, the defendant denied this in his testimony as well.  On the stand, he claimed that prior to his arrest he did not know there was money in the bag he was going to pick up at Jesus' house.  (*Id.* at 1107:1-4.)  His testimony was that he only thought he was going to pick up a package, and that he did not know what was in it.  (*Id.* at 1073:23 - 1074:14.)  When questioned, the defendant claimed that the only reason he told agents that he was there to pick up money was to go along with what the agents said.  (*Id.* at 1110:19 - 1111:4; 1113:8 - 1114:4.)  In fact, he affirmatively denied that he told the agents that he knew about the money before he arrived at the house; instead, he claimed that the agents "tricked" him into talking about money.  (*Id.* at 1113:8 - 1114:18; *see also* 1116:17-25 (defendant claimed he was tricked into saying that he knew that someone had gone to the Escatels' homes).)

Even if the defendant had accepted responsibility in his post-arrest interview – and he did not – his testimony at trial represented a wholesale retreat from the incriminating statements he

made to agents when they arrested him.  Therefore, he cannot receive any deduction for acceptance of responsibility.

**IV.    <u>The Obstruction Of Justice Enhancement Is Appropriate</u>**

The defendant claims that he cannot receive an obstruction of justice enhancement for two reasons: (1) the jury asked for a clarification of the meaning of "immediacy" in the instruction for the duress defense; and (2) the Norteño gang engages in criminal activity in the area in which he claims they first approached him.

The defense uses the jury's question about "immediacy" to posit that the jury was weighing the evidence to determine whether the defense had been met, and, implicitly, that they must have given some credit to the defendant's testimony.  Even to the extent the jury's deliberations can be assessed through their question, whatever the jury thought about the defendant's testimony is immaterial to the Court's assessment of whether the defendant obstructed justice on the stand.  In fact, the Supreme Court has held that judges who elect to impose the § 3C1.1 enhancement "must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out."  *United States v. Dunnigan*, 507 U.S. 87, 95 (1993).  That is, the court should establish that "the defendant's testimony under oath was false; that the defendant knew that the testimony was false, so as not to punish him for faulty memory; and that the false testimony was material to the matters before the court."  *United States v. Armstrong*, 620 F.3d 1172, 1176 n.2 (9th Cir. 2010) (citing *Dunnigan*, 507 U.S. at 95.  As demonstrated in the government's sentencing memorandum, the trial record is replete with instances in which the defendant offered false and absurd testimony on the central issue in the case – whether he was coerced into the criminal conduct with which he was charged.

The defendant's proposition that the Norteños are criminal active in Redwood City similarly misses the point.  There is no question that the Norteños commit crimes.  The problem with the defendant's selection of the gang as his scapegoat, however, is that they do not commit

the type of crimes at issue in this case.  (*See* Barry Decl., Ex. A at 961-65 (testimony of Detective Gabriel Huerta).)  Thus, his claim that Norteños forced him to participate in the extortion against the Escatels is patently false, and the obstruction of justice enhancement is appropriate.

## CONCLUSION

For the reasons set forth above, none of the defendant's challenges to the government's Sentencing Guidelines determination withstands scrutiny, and the United States respectfully requests that the Court sentence the defendant Frank Solorza to the low end of the Guidelines range – 51 months in custody – followed by three years of supervised release and a $100 special assessment.

Dated: April 15, 2011                                   Respectfully submitted,

                                                         MELINDA HAAG
                                                         United States Attorney

                                                         _____
                                                               /s/
                                                         KEVIN J. BARRY
                                                         DENISE MARIE BARTON
                                                         Assistant United States Attorneys